# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-04-00452-CV

### In the Interest of L. M. M. and S. D. M.

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 395TH JUDICIAL DISTRICT NO. 01-1272-F395, HONORABLE MICHAEL JERGINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal arises from a twelve-year custody battle between L.M.M.'s and S.D.M.'s[1] parents, Rhonda Moe and John Malmquist. Moe appeals the trial court's order denying her motion to modify, maintaining both parents as joint managing conservators with Malmquist having the right to determine the children's primary residence, and putting restrictions and conditions upon Moe's rights of possession and access. Moe's parents, Harold and Irene Moe,[2] intervened below, seeking to be appointed as conservators of the children, and now join Moe as appellants to challenge the attorney's fees awarded against themselves and Moe, jointly and severally, in favor of Malmquist's attorney and the children's attorney ad litem. We will affirm the June 2004 order, but reverse an award of appellate attorney's fees that was contained in a subsequent, void order.

---

[1] L.M.M., the daughter, turned sixteen in April 2005, and S.D.M., the son, will be fifteen in September 2005.

[2] We will refer to the mother as "Moe" and the grandparents as "Harold and Irene" or "the grandparents."

**PROCEDURAL BACKGROUND**

Since the final divorce decree was entered in July 1994, both parents have filed multiple motions to modify conservatorship and both have been held in contempt on multiple occasions for violating court orders pertaining to their parental actions. Also, both parents have consistently disputed their financial responsibility for child support, the children's medical expenses, and the unpaid fees owed to their personal attorneys, the attorney ad litem, and the children's therapist. The trial court recognized that both parents—but particularly Moe—have overlooked the damage this litigation has inflicted on their children and have, in fact, involved L.M.M. and S.D.M in the cross-fire.

The phase of litigation at issue began with an April 2003 motion that Moe filed to reduce her child support obligation and collect her attorney's fees. She later filed several amended motions to additionally request that the trial court hold Malmquist in contempt, award her additional periods of possession, award her the right to determine S.D.M.'s primary residence, and appoint her as the children's sole managing conservator.[3] The attorney ad litem intervened seeking to enforce

---

[3] The record presents some confusion over the exact modifications sought by Moe. On its face, her *Second Amended Petition to Modify Parent-Child Relationship* makes no mention of a request to be appointed as the children's sole managing conservator, and such a request was likewise not made in her prior motions to modify. Instead, her petition makes a series of allegations about Malmquist's behavior with the children—that he would drink and drive, make disparaging comments about Moe, and abuse the children emotionally and physically—and requests that she be given the right to determine S.D.M.'s primary residence. Also, Moe testified that she wanted L.M.M. to live with Malmquist and S.D.M. to live with her. Nevertheless, the court and other parties refer to Moe's petition as a request that she be appointed sole managing conservator of the children. For example, in its findings of fact and conclusions of law, the trial court specifically found that Moe's "request to be appointed as sole managing conservator of [L.M.M. and S.D.M.] is not in the best interest of [the children]." And, in his brief, Malmquist cites to Moe's petition as a "request that she be named as sole managing conservator of the children." Although it does not appear that Moe asserted this

the prior orders, hold the parents in contempt for their violations, enjoin them from further violations, and impose additional orders upon them. Malmquist responded, denying Moe's allegations, seeking attorney's fees, and asking the court to deny Moe's requests. Harold and Irene Moe, the grandparents, then filed a plea in intervention seeking that they be named sole managing conservators or joint managing conservators and that they recover their attorney's fees. Malmquist and the ad litem filed additional motions to collect their attorney's fees.

After a four-day hearing in October 2003 and a three-day review hearing in March 2004,[4] the trial court announced its proposed order, and the parties reconvened in April and May to further discuss the details of what should be included in that order. The court then signed a final order on June 28, 2004, which maintained Moe and Malmquist as joint managing conservators with Malmquist having the right to establish the children's primary residence, but placed additional restrictions on Moe's rights of possession and access, and conditioned her rights on continued psychological treatment. The June 2004 order also awarded attorney's fees against Moe and the grandparents, jointly and severally, in favor of the ad litem (for $15,000) and Malmquist's attorney

---

request within the four corners of her petition, for the purpose of this appeal, we will assume that a request by Moe to be the children's sole managing conservator was properly before the trial court.

[4] At the conclusion of the October 2003 hearings, the children were temporarily placed at the Texas Baptist Children's Home, by agreement of the parties, until a better solution could be found. On October 30, 2003, the court ordered that, until the March 2004 review hearing, Malmquist would retain the right to establish the children's residence, but the location was limited to the grandparents' home, and that Malmquist would have possession on the first, third and fifth weekends, as well as the winter holidays, while Moe was to have only supervised visits twice a month at Kids Exchange once she completed her contempt sentence and began treatment with a therapist.

3

(for $20,000, without mention of any fees that might be incurred on appeal) and awarded attorney's fees against Malmquist in favor of the ad litem (for $5,000).

In July 2004, Moe filed a motion for reconsideration and/or for a new trial, and Malmquist filed a motion to reform the judgment to include an award of appellate attorney's fees. At a hearing on July 23, 2004, the trial court denied Moe's requests and stated that it would enter an award of $5,000 in favor of Malmquist's attorney against Harold and Irene in the event that they filed an unsuccessful appeal. Although the court requested at that time for Malmquist's attorney to prepare an order reflecting that award, no such order appears in the record. The award of appellate fees was not memorialized in writing until October 18, 2004, when the trial court issued a modified final order, which differed from the June order only by its inclusion of the appellate attorney's fees award. The parties agree on appeal that the October 2004 order is void because it was issued after the expiration of the court's plenary power and that the June 2004 order controls. In November 2004, the trial court issued findings of fact and conclusions of law in response to requests by Moe and the grandparents.

Moe appeals, challenging the trial court's order regarding conservatorship issues and attorney's fees. Harold and Irene also appeal, confining their challenge to the award of attorney's fees. Malmquist responds that the trial court committed no abuse of discretion regarding either the conservatorship issues or the attorney's fees and asks this Court to uphold the June 2004 order in all respects. Malmquist also urges that, although the October 2004 order is void, the award of appellate attorney's fees should be upheld as a temporary order pursuant to section 109.001 of the family code.

4

*See* Tex. Fam. Code Ann. § 109.001 (West 2002). The ad litem asserts that the award of ad litem fees against Moe and the grandparents, jointly and severally, should be upheld.

## CONSERVATORSHIP ISSUES

Although the June 2004 order maintained Moe and Malmquist as joint managing conservators with Malmquist having the exclusive right to determine the children's primary residence, as the case had been since August 2002, it modified Moe's possession and access rights by adding restrictions and conditions to the terms. Whereas the August 2002 order employed the family code's "standard possession order," as set forth in sections 153.311 through 153.317, the June 2004 order stated that "the provisions of the Standard Possession Order are not appropriate in this case and . . . would not be in the children's best interest." *See* Tex. Fam. Code Ann. §§ 153.311-.317 (West 2002 & Supp. 2004-05). Instead, the court crafted an order that conditioned Moe's rights of possession and access on her attending therapy with Dr. Thomas Lowry. The court ordered that, thirty days after Moe had "begun a regular course of psychological treatment with Dr. Thomas Lowry and [] provided proof thereof [to all parties]," she could engage in supervised visitation at Kids Exchange from 9:00 a.m. to 12:00 p.m. on the second and fourth Saturdays of each month and, once notice of her treatment with Dr. Lowry had been provided, she could have telephone contact with the children. The court also provided for the possibility of increased possession by Moe if certain conditions were met. It ordered that, if Moe continued her treatment with Dr. Lowry, then as of August 1, 2004, she could have the children on the second and fourth Saturdays from 9:00 a.m. to 10:00 p.m., and as of September 1, 2004, from Saturday at 9:00 a.m. to Sunday at 6:00 p.m. These periods of possession were to be supervised by Harold Moe until September 15, 2004, and thereafter

5

could be unsupervised. Then, on December 1, 2004, assuming Moe continued treatment with Dr. Lowry, the terms of the family code's standard possession order would supersede the June 2004 order, providing Moe with additional conservatorship rights.[5] All possibilities of Moe's increased possession were, however, subject to her compliance with the order that she continue treatment with Dr. Lowry. And the court ordered that Dr. Lowry should consult the children's therapist to "determine the impact of the increased possession," and "[i]f Dr. Thomas Lowry **and** the children's counselor agree that any specific period of possession is not in the best interest of the child or children, and have stated so in writing, that period of possession is ordered [to] not occur."

Moe challenges the conservatorship order on two basic grounds: she urges that the trial court abused its discretion in awarding certain privileges to Malmquist and in imposing certain limitations on her. More specifically, Moe asserts that the trial court abused its discretion and violated the family code by (1) maintaining Malmquist as joint managing conservator with the right to determine the children's primary residence because Malmquist has a history of abusing the children, making it impermissible for him to be the joint managing conservator under section 153.004(b) of the family code, and by (2) granting Moe less than the standard possession order, as defined by section 153.311 of the family code; by not awarding Moe specific, enforceable periods of possession and access; and by making Moe's visitation rights dependent on the approval of her and the children's therapists, which poses the risk that her parental rights could be unconstitutionally denied by *de facto* termination and which constitutes an impermissible delegation of the trial court's

---

[5] Those specific terms were set forth in an attachment to the June 2004 order.

authority to determine conservatorship rights. *See id.* § 153.004(b) (West Supp. 2004-05), § 153.311 (West 2002).

**Standard of Review**

In determining issues of conservatorship and possession and access, the primary consideration is always the best interest of the child. *See id.* § 153.002 (West 2002); *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002). Trial courts have broad discretion to determine what is in a child's best interest. *Coleman v. Coleman*, 109 S.W.3d 108, 110 (Tex. App.—Austin 2003, no pet.). A trial court's order modifying a joint managing conservatorship will not be disturbed on appeal unless a clear abuse of discretion is established by the complaining party. *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.). This is because conservatorship determinations are "intensely fact driven," *Lenz*, 79 S.W.3d at 19, and the trial court is in the best position to observe the witnesses and "can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Echols*, 85 S.W.3d at 477. To demonstrate an abuse of discretion, therefore, the appellant must show that the trial court acted in an arbitrary or unreasonable manner, or without reference to guiding principles of law. *Coleman*, 109 S.W.3d at 110. As long as some evidence of a substantive and probative character exists to support the order, we will not substitute our judgment for that of the trial court. *Echols*, 85 S.W.3d at 477.

**Evidence Before the Trial Court**

Over the course of several hearings in October 2003 and March 2004, the trial court heard testimony from over two dozen witnesses, including many mental health and educational

professionals, and conducted in camera interviews with L.M.M. and S.D.M. concerning Moe's and Malmquist's behaviors and the family's general situation. The overall theme that developed through this wealth of evidence was as follows: Moe and Malmquist have had a highly contentious relationship since 1994, and the children have suffered, academically and emotionally, as a result. As stated by the children's therapist, the family has been in "perpetual crisis mode" for several years, and as described by Moe's sister, "[Moe and Malmquist] don't speak to each other, but they fight each other through the kids." Although various courts have repeatedly ordered the parents to not disparage the other in front of the children, to not involve the children in the custody and child support disputes, and to maintain a consistent regimen of counseling for both themselves and the children, both parents have failed to comply with these orders and have been held in contempt for their failures. Several witnesses described Moe as having psychological disorders, exhibiting intense and uncontrollable anger, obsessing over things she believes Malmquist has done wrong, and consistently using the children as weapons against Malmquist. Despite this, evidence was presented that S.D.M. is protective of his mother and feels bonded to her, and that Moe loves her children. Regarding Malmquist, witnesses repeatedly testified that he has an authoritarian attitude, uses physical discipline, relies on calling the sheriff's department to resolve his disagreements with the children, and is unable or unwilling to communicate with the children. On the other hand, several witnesses described Malmquist as being very involved at the children's school, being attentive to and concerned about their needs and successes, using appropriate methods of discipline, and doing the best he can in the difficult situations that Moe creates between him and the children.

In addition to general testimony about the parents' characteristics and the family's situation, the trial court also heard testimony about several specific episodes. This evidence is significant because the trial court made several comments on the record that these episodes influenced its determinations about what conservatorship arrangement was in the best interest of the children.

Michelle Heckroth, a school counselor, testified about an incident that occurred between Moe and L.M.M. on May 19, 2003. Heckroth testified that Moe was "loud and upset" and "caused a scene" in front of the middle school, apparently in response to L.M.M. having "flipped her the bird." Moe screamed at L.M.M. that she was "white trash" and, despite Heckroth's efforts to calm Moe down, her level of intensity did not subside. Another school counselor, Andrew Karbo, who also witnessed the scene, heard Moe call L.M.M. a "bitch" and saw that Moe was "out of control." Heckroth testified that Moe blamed Malmquist for the occurrence and, when Heckroth attempted to counsel her about this incident, Moe only wanted to talk about Malmquist's shortcomings and continued to belittle him in front of the children. At the end of the encounter, Moe said to Heckroth, "it's not over. She'll pay for this." Heckroth testified that Moe and L.M.M.'s relationship consisted of "a lot of hate, a lot of anger" and that, in twenty-one years of education, she had "never seen a mother degrade her child like that."

Several witnesses testified about an episode in September 2003, when Moe equipped S.D.M. with a tape recorder and instructed him to take it to Malmquist's house, conceal it in a backpack, provoke a fight with Malmquist, and record Malmquist's reaction. Moe's instructions to S.D.M., which she gave when they were practicing using the device, were caught on tape. She

9

admitted that it was her voice on the tape telling S.D.M. that, "when you get to court . . . you need to tell . . . all the stuff we do" and "[y]ou need to tell what you hate about living with [Malmquist]. . . . [H]e just sits around and f—ing drinks. . . . We'll kick his ass in court if you just listen to me and just do what I say." She acknowledged that this was a "direct violation of the August 2002 order," but claimed she only did it to have evidence for the sheriff's department and that she "didn't think about . . . it endangering [S.D.M.]." The trial court commented that he believed Moe's actions with the tape recorder were "evil, and I think my opinion's important on that issue."

Evidence was also presented to the trial court that Moe instructed the children to write letters about Malmquist's shortcomings and about their alleged preference to live with Moe. A counselor with Mothers Against Drunk Driving testified that, when Moe contacted her with concerns about Malmquist drinking and driving, she advised Moe to have the children write letters expressing their feelings, but did not intend for Moe to "coach" or "prompt" them about what to write. Moe admitted that she instructed the children to write the letters and that she knew it was in violation of the August 2002 order.

Regarding Malmquist's behavior, the trial court heard testimony about various incidents where Malmquist called the sheriff's department to resolve disputes with his children. The two most prominent of these incidents involved S.D.M. In the first, Malmquist noticed that a child support check, written to him from Moe's employer, was missing from his desk. S.D.M. denied having taken it. Two months later, Malmquist took S.D.M. to the police station about the missing check, and S.D.M. admitted to having taken it. Malmquist claimed he wanted to teach S.D.M. that, "if he did this later in life, [the consequences] would be a lot worse." The officer who handled the

10

missing check incident testified that it is not unusual for parents to bring their children in to be talked to about bad behaviors and that, on average, he talks to children "two or three times a month" about such matters. The children's therapist, however, testified that the use of such a disciplinary tactic was intimidating to S.D.M., made him fearful, and decreased his respect for authority figures.

The second incident involving the sheriff's department occurred in September 2003, in connection with Moe's equipping S.D.M. with the hidden tape recorder. By all accounts,[6] one morning before school, S.D.M. hid the tape recorder in his backpack, and Malmquist told him to take out the trash. S.D.M. refused, and Malmquist attempted to hurry up their morning routine by loading S.D.M.'s backpack into the truck while again telling S.D.M. to take out the trash. When S.D.M. became very possessive of his bag, Malmquist looked inside and found the tape recorder. Malmquist took it and the bag, gave S.D.M. his lunch and books, told S.D.M. to wait outside for the bus, and locked the door. S.D.M. yelled and banged on the door, but Malmquist refused to let him back in. S.D.M. then threw something at the door and broke the window. Malmquist told him to stay put and called the sheriff's department. The officers arrived, handcuffed S.D.M., put him in the squad car, and took him to the downtown station. Malmquist followed. After leaving the station, Malmquist took S.D.M. for an emergency session with the children's therapist, and then took him to school. School personnel testified that S.D.M. was upset and scared to go back to Malmquist's. Malmquist testified that, because S.D.M. was out of control, he believed it was appropriate to get the sheriff's office involved.

---

[6] Several witnesses testified about this episode, including Malmquist, police officers, the children's therapist, school counselors, and S.D.M.

Finally, the issue of Malmquist's alleged drinking-and-driving was also the subject of testimony, in response to Moe's repeated accusations that Malmquist drives drunk with the children. Malmquist acknowledged that he was pulled over on Halloween night, 2001, for driving 48 mph in a 45 mph zone. According to Malmquist, he was detained because another man of the same name had an outstanding warrant. Because the police intended to take him to the station to clear it up, Malmquist's sister came to retrieve the children. Malmquist denied that the reason for his sister coming was because he and his girlfriend were too inebriated to drive. No DWI charges were filed. Although Malmquist admits to often having a mixed drink in the evenings when the children are present, he claims that he does not drink to the point of intoxication and that he never drives intoxicated. Multiple witnesses confirmed that they have never known Malmquist to drink and drive, that it would be inconsistent with his character to do so, and that he drinks responsibly in social settings.

The trial court also heard testimony from key witnesses about their recommendations for a custody arrangement.[7] In October 2003, the children's therapist, Tammy Wanamaker, testified that it was not in the children's best interest to continue the joint conservatorship ordered in August 2002 and that, thus far, they had not been able to achieve a healthy situation when both parents were involved. But, she testified, both children have expressed a desire to have a relationship with both

---

[7] This included conducting individual, in camera interviews with both L.M.M. and S.D.M. Because their living arrangement preferences are not binding on the trial court, *see* Tex. Fam. Code Ann. § 153.009 (West 2002), and we respect the need for confidentiality of this sensitive testimony, their stated preferences will not be repeated here. We presume the trial court considered this testimony, along with all of the other evidence, and afforded it appropriate weight when determining what was in the best interest of the children. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 450-51 (Tex. 1982).

parents, and her general philosophy is to try and keep children "in the home setting and try to promote the relationship with both parents." Wanamaker felt that "intensive" therapy work with both Moe and Malmquist was necessary. Ultimately, Wanamaker testified that she "would like to see the children continue to have contact with their parents. I think that supervised visitation may be helpful for awhile, but I would like to, eventually, see them be able to have nonsupervised time with both parents."

Malmquist testified that "I'm not a perfect parent, but I try the best I can, and I haven't made a hundred percent of the right choices, no one does . . . but I'm not here to condemn myself. I think I've done a great job raising these kids. . . . I got them tutors. . . . [When L.M.M. hid her progress report], I went and got it. . . . [I] take them to school early in the mornings for [S.D.M.'s] football practice and after I drop them off, go to work. And, normally, I don't get home, mostly between 5:30 and 6:00, and in the meantime, they're with [my girlfriend] doing their studies or playing or fishing or football practice. . . . I don't want to eliminate [Moe]. I believe there needs to be supervised visitation of some sort, and that happened before, and it worked out well." Malmquist's sister testified that he should have custody.

Moe acknowledged that she had contributed to the children's emotional and academic problems, but testified that S.D.M. wanted to live with her. She stated that, if she could not have custody of the children, her preference would be that they live with her parents. Two of Moe's sisters, Moe's adult daughter from a previous marriage, and three of Harold and Irene's friends testified that they thought conservatorship should be awarded to the grandparents.[8]

---

[8] On appeal, no party asserts that the grandparents should have been appointed as conservators of the children.

13

At the March review hearing, several witnesses testified that Malmquist had made improvements. Dr. Elizabeth Holtzman, Malmquist's psychologist, testified that Malmquist was committed to the therapeutic process, understood the need to change his authoritarian style, and demonstrated to her that he could provide a stable environment for the children. Scott Matthew, an assistant director for Williamson County Juvenile Services, testified that S.D.M. needed more discipline than Harold and Irene were providing and that, given his experience, it is better to not place children with the grandparents when there is a viable parental option. Nancy Graff, one of S.D.M.'s teachers, testified that Malmquist had been supportive of her efforts to improve S.D.M.'s academic performance. Malmquist testified that he had been attending counseling and parenting classes and reading parenting books; he felt these things were helping him to be a better father. Wanamaker testified that, since October, Malmquist had improved his ability to communicate with the children and had not physically disciplined S.D.M., although their relationship was still "rocky." Wanamaker could not say whether it would be better to leave S.D.M. with Harold and Irene or move him to Malmquist's; she did not feel it would benefit L.M.M. to be moved from her grandparents'; and she felt the children should not be separated.

At the hearing, Moe declined to offer any direct testimony. And other witnesses had little to say about Moe because her involvement with the children since October had been minimal, given the time she spent in jail serving her contempt sentence and that, once released, she failed to begin counseling with Dr. Lowry in order to see the children. Moe testified on cross-examination that she had attended one session with Dr. Lowry, but she had not scheduled another.[9] Irene Moe

---

[9] On April 21, 2004, Dr. Lowry wrote a letter to the court stating, "I believe she can be trusted with standard visitation."

and Moe's sister testified that they did not believe Moe posed a danger to the children, that her visitation did not need to be supervised, and that the court's orders were primarily for the purpose of punishing Moe rather than protecting the children.

Evidence was also presented at the March hearing that, during the five months the children were residing at their grandparents' house, L.M.M.'s behavior and academic performance improved, although she continued to struggle with grades and made poor choices for friends. On the other hand, S.D.M.'s attitude and grades declined drastically. Although the grandparents claimed that he behaved well at home, his teachers reported that he had anger management problems, was failing, was in frequent violation of the dress code, and that he told them he could get away with anything because his grandparents would not discipline him.

**Analysis**

A joint managing conservatorship may be modified only upon establishing that (1) there has been a material and substantial change of circumstances and (2) the modification would be in the best interest of the child. *See* Tex. Fam. Code Ann. § 156.101 (West 2002 & Supp. 2004-05). Here, Moe does not dispute that material and substantial changes to the family's circumstances had occurred since the August 2002 order, but she argues that the trial court's June 2004 order did not modify the conservatorship arrangement in a manner that was in the best interests of L.M.M. and S.D.M. She sought to modify the August order to have Malmquist removed as a joint managing conservator and herself appointed as sole managing conservator. Malmquist responds that, when considering all of the evidence before it, the trial court did not abuse its discretion by denying Moe's motion to modify and maintaining the parents as joint managing conservators with Malmquist having

15

the right to establish primary residence, while placing additional restrictions on Moe's possession and access rights.

*Malmquist's rights of possession and access*

Moe bases her argument against Malmquist's conservatorship on the presumptions established in Chapter 153 of the family code. She argues that, while section 153.131 sets forth a presumption in favor of both parents being named as joint conservators, that was rebutted in this case by evidence that Malmquist abuses the children. *See id*. § 153.004, .131. Moe's arguments are, however, without merit in this modification proceeding because the Texas Supreme Court has unequivocally stated that the presumptions of Chapter 153 do not apply to Chapter 156 modification actions. *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2002) (presumptions in Chapter 153 only govern original custody determinations). Accordingly, in regards to Moe's first issue, the only question presented for our review is whether the trial court abused its discretion in denying Moe's motion to modify.

Because Moe was the party asserting that Malmquist should not be maintained as joint conservator with the right to establish the children's primary residence and that the arrangement should be modified, Moe carried the burden of proof to establish by a preponderance of evidence that it would be injurious to the children to maintain Malmquist and that her appointment would be a positive improvement. *Eason v. Eason*, 860 S.W.2d 187, 190 (Tex. App.—Houston [14th Dist.] 1993, no writ); *Ogrydziak v. Ogrydziak*, 614 S.W.2d 474, 477 (Tex. Civ. App.—El Paso 1981, no writ). She failed to satisfy this burden.

16

Although several witnesses testified that Malmquist physically disciplined the children, such as slapping L.M.M. across the face or wrestling S.D.M. to the ground, none characterized this behavior as "abuse." The children's therapist testified that she did not believe Malmquist was physically abusing the children but she did worry that the exchanges between Malmquist and his son would become "[m]ore physical, maybe more intense," as S.D.M. got larger and older. The therapist also acknowledged that Moe had reported Malmquist to Child Protective Services on multiple occasions, and that each case was resolved in Malmquist's favor. Further, Moe's allegations that Malmquist abused the children by drinking and driving were not corroborated by the testimony, and multiple witnesses testified that they had observed Malmquist with the children and believed they had a good relationship.

When the trial court announced its order in October 2003, he admonished Malmquist for his method of handling disputes by resorting to either physical discipline or the sheriff's department. He then said to Moe that

> [t]he mental, cruel and harmful abuse that you have inflicted over these children is much more severe and much more life damaging than a slap in the face. A kid will get over a slap in the face. I don't know that these kids will get over the garbage you put them through, from [having] them sign the [court] documents and the letters . . ., from giving your child a tape recorder. . . . [and] calling [L.M.M.] white trash and a bitch in front of her friends and her schoolmates and her teachers is disgusting.

At the March 2004 review hearing, the court explained that he could "understand the conflict between [Malmquist's] authoritarian, discipline personality and the [grandparents' soft approach], . . . [but] that's not working for [S.D.M.]" because S.D.M. needs some discipline, and "[Malmquist's] gone to [Dr.] Holtzman, and he's done what I've told him to do."

17

The record demonstrates sufficient evidence to support the trial court's determinations that it was in the best interest of the children to maintain Malmquist as the joint conservator with the right to establish the children's primary residence and deny Moe's motion to modify. Moe failed to establish by a preponderance of the evidence that it would be injurious to the children to maintain Malmquist in this position or that it would be an improvement to appoint Moe as the children's sole managing conservator. *See Eason*, 860 S.W.2d at 190. She also failed to show on appeal that the trial court acted in an arbitrary or unreasonable manner, or without reference to guiding principals of law. *See Coleman*, 109 S.W.3d at 110. The trial court, therefore, did not abuse its discretion. *See Echols*, 85 S.W.3d at 477. Moe's first issue is overruled.

*Moe's rights of possession and access*

In her second, third, and fourth issues, Moe challenges the trial court's modification of her joint conservatorship rights to possession of and access to the children. Moe asserts that it was error for the trial court to award her less than the standard possession order; to not grant her specific, enforceable periods of possession and access; and to condition her rights upon the combined approval of Dr. Lowry and the children's therapist.

Trial courts have discretion to establish the terms and conditions of conservatorship. *Green v. Green*, 850 S.W.2d 809, 812 (Tex. App.—El Paso 1993, no writ); *see* Tex. Fam. Code Ann. § 153.193 (West 2002). This includes the authority to determine the frequency and duration of visits, as well as the limitations and safeguards to be placed on such visits. *Hill v. Hill*, 404 S.W.2d 641, 642 (Tex. Civ. App.—Houston [1st Dist.] 1966, no writ). Trial courts are not obligated to order standard possession; if a court determines that the standard possession order is not in the child's best

18

interest, then the court can either deny possession and access altogether or "fashion an order that restricts possession or access so as to eliminate any danger to the physical or emotional welfare of the child." *In re Walters*, 39 S.W.3d 280, 286 (Tex. App.—Texarkana 2001, no pet.); *see also In re R.D.Y.*, 51 S.W.3d 314, 323 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). Trial courts, however, cannot deny a conservator's rights of possession and access absent a finding that the child's physical and emotional welfare would be endangered by the possession and access, and any limitations placed on such rights cannot exceed that required to protect the child's best interest. *Roosth v. Roosth*, 889 S.W.3d 445, 451-52 (Tex. App.—Houston [14th Dist.] 1994, writ denied).

If a trial court determines that it is in the best interest of the child to place restrictions or conditions on a conservator's rights of possession and access, then it is the court's responsibility to specifically define those terms in its decree. *In re A.P.S.,* 54 S.W.3d 493, 499 (Tex. App.—Texarkana 2001, no pet.); *Hill*, 404 S.W.2d at 643. The judgment must state in clear and unambiguous terms what is required for the conservator to comply, and the terms must be specific enough to allow the conservator to enforce the judgment by contempt. *In re A.P.S.,* 54 S.W.3d at 498; *Roosth*, 889 S.W.2d at 452; *see also In re Walters*, 39 S.W.3d at 288.

As in her first issue, Moe relies on a Chapter 153 presumption to support her second issue, claiming that she is entitled to the standard possession order. *See* Tex. Fam. Code Ann. § 153.137 (West Supp. 2004-05) (standard possession order constitutes presumptive minimum amount of possession for parent named as joint managing conservator who is not awarded right to establish children's primary residence). But the supreme court has held that the presumptions in

19

Chapter 153 are only applicable in original custody cases, not in modification proceedings such as this one, which are governed by Chapter 156. *In re V.L.K.*, 24 S.W.3d at 343.

The trial court was afforded broad discretion in establishing the terms of conservatorship and it was not obligated to order standard possession. *In re Walters*, 39 S.W.3d at 286. Moreover, the court explained on the record why the standard possession order was not initially appropriate in this case[10] and it structured the order so that, within six months from the date of the order, Moe would be entitled to standard possession, assuming she had established and continued treatment with Dr. Lowry. Thus, Moe's claim that the trial court abused its discretion by awarding her less than the standard possession order is without merit, and her second issue is overruled.

Moe's only argument with regard to her third issue—that the trial court erred by not giving her specific, enforceable periods of possession—is that "[i]t has been repeatedly held that denials of specific periods of visitation should only be ordered in the most extreme of circumstances." *See Roosth,* 889 S.W.2d at 451. While we agree with this proposition, it does not support Moe's claim because, in conditioning Moe's rights on her continued therapy, she was not denied specific, enforceable periods of possession. To the contrary, the court's order sets forth very specific terms of her possession and access rights.

The June 2004 order stated that Moe had to (1) begin treatment with Dr. Lowry, (2) notify all the parties of such compliance, and (3) continue that treatment for thirty days. At that

---

[10] The court stated that Moe "has had opportunities prior to the hearing in October, as far back as almost 10 years, to go to the counseling. . . . And she has continually and willfully refused to do it, and I'm not going to make it any more convenient for her now. It's Dr. Lowry, and she can either go or she cannot go. . . . But the gate to visitation, [Moe] has the key."

20

point, she was entitled to supervised visitation at Kids Exchange on specified dates and to telephone contact with the children. Thereafter, beginning in August 2004, as long as she continued treatment with Dr. Lowry, Moe was entitled to increased periods of possession and access—with very specific times, dates, and locations provided for—culminating in a December 2004 return to standard possession. Accordingly, the terms of what Moe was required to do in order to obtain and enhance her rights of possession and access were unambiguous, specific, and enforceable. Moreover, the family code expressly grants trial courts authority to order that conservators "participate in counseling with a mental health professional." Tex. Fam. Code Ann. § 153.010(a) (West 2002). The trial court, therefore, did not abuse its discretion by conditioning Moe's rights on her continued therapy with Dr. Lowry. Her third issue is overruled.

Finally, Moe challenges the conservatorship arrangement on the grounds that it permitted Dr. Lowry and the children's therapist to order that a particular period of possession not occur if the therapists mutually agreed that it would not be in the children's best interest and stated so in writing. She asserts that this order poses the threat that the therapists could cause a *de facto* termination of her parental rights by agreeing that it would be in the children's best interest for Moe to be denied all periods of possession and access; she urges that giving them the ability to deny her all possession of and access to her children, without any court intervention, violates her constitutional rights as a parent, *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003), and constitutes an impermissible delegation of the trial court's authority to make judicial determinations.

We first address Moe's claim that the order empowered the therapists to prevent her from "ever again see[ing] her own minor children." In raising this issue, Moe overlooks the

21

significant distinction between the terms "possession" and "access." Although the terms are sometimes used interchangeably, they represent two different concepts in the family code. *In re Walters*, 39 S.W.3d at 284. The right of access permits a conservator to approach, communicate, and visit with the child, whereas the right of possession allows the conservator to exercise control over the child to the exclusion of all others during a specified period. *Id.* Here, the order empowered the therapists to deny Moe only a period of possession, not access.[11] Moe holds the key to that ability by attending her therapy sessions with Dr. Lowry: As long as Moe continues her treatment with Dr. Lowry, then she is, at a minimum, permitted access to or visitation with her children.

In light of the evidence that Moe had caused mental and emotional damage to her children over the last decade, it was reasonable for the trial court to determine that limitations needed to be placed on her rights of possession. Furthermore, the limitation it imposed sufficiently safeguarded against a *de facto* termination of Moe's rights (1) by requiring that the therapists agree to deny a period of possession and that they state their agreement in writing, (2) by limiting their right to deny possession to one particular period at a time, and (3) by permitting them to deny Moe possession, not access. Because the trial court placed restrictions only on Moe's rights of possession, rather than denying her all rights of possession and access, her constitutional rights are not implicated by the June 2004 order.

The question remains, however, whether it was a proper exercise of the court's discretion to delegate authority over Moe's rights of possession to the therapists. Although we are

---

[11] The trial court's order specifically stated that, upon the therapists' written agreement that "any specific period of *possession* is not in the children's best interest, . . . that period of *possession* is ordered [to] not occur." (Emphasis added.)

22

aware of no other court that has addressed the issue of whether a conservator's right to possess a child may be contingent on a mental therapist's approval, other courts have addressed whether it is appropriate to leave that determination within the discretion of another conservator.[12]

In *Hill*, the First Court of Appeals held that the trial court abused its discretion by making the father's right to visit his children contingent upon securing the written permission of their mother, the managing conservator. 404 S.W.2d at 643; *see also Wright v. Wentzel*, 749 S.W.2d 228, 234 (Tex. App.—Houston [1st Dist.] 1988, no writ) (trial court erred by making mother's visitation rights contingent on father's consent). In *Roosth*, the Fourteenth Court of Appeals similarly reversed an order that gave the mother "complete discretion to determine when, where, and if [the father] may have possession of or access to the children," because this grant of "absolute discretion" to the mother denied the father an ability to enforce the judgment by contempt. 889 S.W.2d at 452. The Texarkana Court of Appeals also reversed an order that conditioned the mother's possession rights on the father's agreement because it was "not sufficiently specific." *In re Walters*, 39 S.W.3d at 288; *see also In re A.P.S.*, 54 S.W.3d at 498 (trial court abused discretion in ordering that mother was entitled to possession "at reasonable times and places as determined by [father]" because it gave father complete discretion over mother's rights and denied mother ability to enforce order by contempt).[13]

_____

[12] *See In re R.D.Y.*, 92 S.W.3d 433 (Tex. 2002) (Justice Hecht writing that petition for review should be granted because courts of appeals disagree about whether it is permissible to order that conservator's possession rights are "solely at the discretion of a managing conservator," and listing relevant opinions).

[13] Contrary to these cases, however, in *In re R.D.Y.*, the First Court of Appeals affirmed a trial court's order that gave the grandmother "sole discretion" over the mother's possession rights

23

These cases, however, are distinguishable from the instant one in two, significant respects. First, the conflict that results from allowing one conservator to have absolute discretion over the other conservator's rights is readily apparent because it gives an adverse party the right to completely deny possession and/or access to the other. Here, that is not the case because the decision-makers, the therapists, are presumably neutral third parties.

Second, the orders in the above-mentioned cases did not sufficiently specify the terms upon which the decision-maker could deny the conservator's possession or visitation rights. Instead, the orders simply stated that possession could not occur unless the conservator obtained the other's "written permission," *Hill*, 404 S.W.2d at 643, "consent," *Wright*, 749 S.W.2d at 234, or "mutual agreement," *In re Walters*, 39 S.W.3d at 288. Thus, in these cases, absolute, unconditional discretion was granted over the conservator's rights of possession and access. Here, on the other hand, the therapists were not permitted to deny Moe a single period of possession without first reaching a mutual, written agreement that it was in the children's best interest to do so. This is in accord with

based on the grandmother's determination of whether the mother was "mentally and physically capable of exercising her visitation with the child." 51 S.W.3d 314, 323 n.1, 324 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). The court held this order was not an abuse of discretion because the mother could enforce it by filing a motion to modify if she felt the grandmother was abusing her power to evaluate whether or not the mother was capable of exercising her visitation rights. *Id*. at 324. We agree with the Texarkana court's statement about *In re R.D.Y.* that, "[a]lthough a judge can rightfully restrict the conditions of [visitation] . . ., we respectfully disagree . . . that giving total discretion, unenforceable by contempt, to one conservator constitutes a mere restriction on the conditions of visitation." *In re A.P.S.*, 54 S.W.3d 493, 499 (Tex. App.—Texarkana 2001, no pet.).

what the family code requires a trial court to find prior to denying conservatorship rights. *See* Tex. Fam. Code Ann. § 153.002. While it may not be appropriate in all cases for the trial court to delegate such authority to third parties, here the decision-makers were mental health professionals appointed by the court, and the trial court maintained the power to review their decisions if challenged by the parties.

The terms of this order are sufficiently specific so as to be enforceable by contempt, and the trial court, therefore, did not abuse its discretion in granting the therapists the right to deny Moe a specific period of possession if they mutually agreed it was in the best interest of the children. Moe's fourth issue is overruled.[14]

## ATTORNEY'S FEES

The final order issued in June 2004 awarded attorney's fees against Moe and the grandparents, jointly and severally, in the following amounts: $15,000 for Laurie Nowlin, the attorney ad litem, and $20,000 for John Barrett, Malmquist's attorney.[15] The June order was confined to the attorneys' work during the trial phase and did not mention any appellate fees. Malmquist, therefore, filed a motion to reform the judgment on July 20, 2004, seeking an attorney's fee award of $20,000, should Moe and/or the grandparents appeal. Moe responded with her own motion for reconsideration, urging that the initial award of attorney's fees was unjust and that

---

[14] Moe states that her four issues regarding the conservatorship order constitute a challenge to twelve findings of fact issued by the trial court in relation to that order. The record demonstrates sufficient evidence to support those findings.

[15] Malmquist was also ordered to pay the attorney ad litem $5,000, which he does not dispute on appeal.

25

Malmquist's motion to add appellate fees should be denied because $20,000 was an unconscionable amount. At a hearing on July 23, 2004, the trial court denied Moe's motion, announced it would award Malmquist's attorney $5,000 in appellate fees, and asked that an order be prepared to reflect that pronouncement. The only written memorialization appearing in the record of the July pronouncement, however, is a reformed final order issued on October 18, 2004,[16] which was after the trial court's plenary power expired. *See* Tex. R. Civ. P. 306a, 329b (regarding timetables for plenary power).

On appeal, Moe and the grandparents challenge the awards assessed against them in favor of both the ad litem and Malmquist's attorney, for both the trial and appellate phases. They urge (1) that each of these awards constituted an abuse of the trial court's discretion, (2) that it violated section 261.106 of the family code to assess Malmquist's attorney's fees against them, and (3) that the October 2004 award of appellate fees is void based on the expiration of the court's plenary power.

**Abuse of Discretion**

Section 106.002 of the family code governs the award of attorney's fees in suits affecting the parent-child relationship. Tex. Fam. Code Ann. § 106.002 (West Supp. 2004-05). In such cases, we review the award of attorney's fees for an abuse of discretion. *Tull v. Tull*, 159

---

[16] The order stated that the appellate fees were awarded against Moe and the grandparents, jointly and severally, in favor of John Barrett, and that the award was "conditioned on the pursuit by any or all of said parties of an ultimately unsuccessful appeal." It also provided for a remittitur of $5,000 to Moe and the grandparents, jointly and severally, "if an appeal is not perfected."

26

S.W.3d 758, 760 (Tex. App.—Dallas 2005, no pet.). There is no abuse of discretion where an award of attorney's fees is supported by the evidence. *Id.*

Moe's only argument in support of her claim that the trial court abused its discretion by awarding attorney's fees against her[17] is that her allegations that Malmquist "batter[ed] the children and [her] allegations of child abuse were not only brought in good faith but were proven to be absolutely true." As discussed in relation to the conservatorship issues, the evidence did not corroborate Moe's allegations of abuse, but instead was sufficient to support the trial court's finding that Malmquist had not engaged in a pattern or history of abuse towards L.M.M. or S.D.M. Accordingly, this claim does not demonstrate an abuse of discretion on behalf of the trial court. Moe's fifth issue is overruled.

Harold and Irene, on the other hand, assert several grounds for their claim that the trial court abused its discretion in awarding attorney's fees against them in favor of the ad litem and Malmquist's attorney. They urge that these awards constitute impermissible sanctions levied against them in an attempt to collect fees owed by their apparently insolvent daughter,[18] which are designed to punish them for helping her financially[19] and to discourage them from being involved in further

---

[17] Moe claims it was an abuse of discretion to assess "any" fees against her for Malmquist's attorney and to assess "the greater portion of" the fees against her for the ad litem.

[18] They believe the court awarded fees against them jointly and severally because Malmquist's attorney has been unable to collect a prior judgment against Moe (for $20,000 in fees) since 1997.

[19] Irene testified that, including the $2,500 worth of attorney's fees that they have paid for Moe in the current litigation, the total amount of attorney's fees they have paid on Moe's behalf is approximately $42,000, that Moe has paid very little of it back, and that they do not expect her to reimburse them. She also testified that they purchased the mortgage on Moe's house in 2001; the

27

litigation regarding the custody of their grandchildren. Harold and Irene also urge that the awards were an abuse of discretion because the ad litem and Malmquist's attorney failed to segregate their fees among Moe and them and between different proceedings, actions, and motions; they urge that they should not be responsible for any fees incurred prior to August 26, 2003, the date they intervened. Finally, the grandparents challenge the award of the ad litem's fees against them on the grounds that there is no evidence or insufficient evidence that their conduct made the appointment of the ad litem necessary.

*Attorney's fees as sanctions*

Harold and Irene's argument that the attorney's fees were assessed against them as an impermissible sanction is without merit because the trial court did not award the attorney's fees as sanctions. The court denied Malmquist's motion to enter a monetary sanction against Harold and Irene[20] and stated that these fees were awarded against them "[p]ursuant to Section 106.002 of the Texas Family Code . . . as reasonable and necessary attorney's fees and expenses." Thus, rather than constituting an award of sanctions for any fees that accrued or any conduct that occurred in prior litigation, the attorney's fees awarded in the June 2004 order are merely a judgment to collect the

---

total cost of the loan was $87,925. Moe testified that Harold and Irene do not require her to pay rent.

[20] On October 21, 2003, Malmquist filed a motion seeking (1) a judgment of attorney's fees in favor of his attorney, jointly and severally against Moe and the grandparents, and (2) the entry of a monetary sanction against Harold and Irene. The June 2004 order stated that it considered all motions before it, that the relief sought by Malmquist was denied in part and granted in part, and that all requested relief "not expressly granted herein is denied." The June order did not mention the sanctions sought by Malmquist and, therefore, it denied that relief.

fees that accrued in the current phase of litigation, which was initiated by Moe and in which the grandparents intervened.

Harold and Irene do not dispute that they were a party to the instant case, and they do not challenge that the fee amounts awarded to either Malmquist's attorney or the ad litem were unreasonable or unnecessary. Instead, they only dispute their responsibility for the fees by claiming that the record demonstrates no evidence or insufficient evidence to find that they have aided, abetted, encouraged, or conspired with Moe in the litigation, or that their actions have been frivolous or in bad faith. Because these fees were not entered as sanctions, however, there is no need for evidence of conspiracy or bad faith on their behalf. Rather, to affirm the award, there need only be sufficient evidence in the record upon which the trial court could determine the award was "reasonable." In a suit affecting the parent-child relationship, this is the only statutorily-defined requirement and trial courts are otherwise afforded broad discretion in determining the propriety of an attorney's fees award. *See* Tex. Fam. Code. Ann. § 106.002.

The legal and factual sufficiency of the evidence are factors to be considered in whether the trial court abused its discretion, but they are not independent grounds of error. *Doyle v. Doyle*, 955 S.W.2d 478, 479 (Tex. App.—Austin 1997, no pet.). In reviewing the legal sufficiency of the evidence, we consider the evidence in a light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true and we must disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005). "Under traditional factual sufficiency standards, a court determines if a finding is so against the great weight and

preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias." *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

Although the grandparents claimed to be adverse to Moe in the current litigation, their testimony revealed otherwise. When asked what Moe had done wrong as a parent, Harold testified that "the only thing I can think of [is] talking about their father and stuff like that in front of the kids." He was asked this question several times, but offered nothing further. The trial court expressed surprise that, although "given five opportunities," Harold failed to mention either the tape-recorder incident involving S.D.M. or the school incident, where Moe screamed at and belittled L.M.M. Irene testified that she did not believe Moe posed a psychological danger to the children, that Moe's visits with the children did not need to be supervised, and that the court's limitations on Moe's rights were imposed as punishment. Moe's sister agreed that "the goal that [she, Moe, the grandparents], and other family members have had for the last eight years is to have custody of these children removed from [Malmquist] and restored to [Moe]." The other evidence concerning whether the grandparents encouraged Moe's previous litigation through their financial support is irrelevant to this issue because the fees awarded in the June 2004 order only pertain to the attorneys' work in the current action, which was brought by Moe and to which the grandparents were a party.

Because there is legally sufficient, credible evidence on which the trial court could determine that the grandparents were aligned with Moe in the current litigation and because the fees were not awarded as sanctions, it was not an abuse of discretion for the trial court to determine that it was "reasonable" for Harold and Irene to be held jointly and severally responsible for the resulting attorney's fees accrued by Malmquist's attorney and the ad litem.

30

*Failure to segregate fees*

Harold and Irene also challenge the attorney's fees award on the grounds that the attorneys failed to segregate their fees as between Moe and themselves[21] or between various proceedings, actions, and motions. They urge that it was an abuse of discretion to hold them responsible for any fees that accrued prior to their intervention into the lawsuit on August 26, 2003.

Because Harold and Irene do not cite any authority in support of their claim that the attorney's fees were unreasonable unless segregated, this issue is waived. *See* Tex. R. App. P. 38.1 (appellant's brief must contain "a clear and concise argument . . . with appropriate citations to authorities).

Furthermore, Harold and Irene do not appear to have otherwise preserved error on the issue of whether the trial court abused its discretion by awarding unsegregated fees against them. *See* Tex. R. App. P. 33.1 (to preserve appellate issue, party must present timely, specific objection, request, or motion and obtain ruling or refusal to rule from trial court); *Villasenor v. Villasenor*, 911 S.W.2d 411, 420 (Tex. App.—San Antonio 1995, no writ) (complaint about failure to segregate attorney's fees was waived because not raised in open court or specifically in motion for new trial). When the ad litem offered testimony of her attorney's fees and an exhibit in support of them, the grandparents did not object on any ground, including the failure to segregate fees. On cross-examination of the ad litem, their counsel elicited testimony that, since the grandparents'

---

[21] Harold and Irene additionally claim that Malmquist's attorney should have allocated the fees between the ad litem, in addition to Moe and themselves, and that the ad litem should have allocated her fees against Malmquist, in addition to Moe and themselves. But since no fees were assessed against the ad litem, any failure to segregate fees to the ad litem is immaterial. Further, a portion of the ad litem's fees were assessed separately against Malmquist, and so this argument is also without merit.

31

intervention, the ad litem had accrued about $37,000 in fees, about $15,000 of which pertained to the motion to modify. This evidence supports the trial court's award of $15,000 in favor of the ad litem, jointly and severally against Moe and the grandparents, because that is the amount she testified had accrued since their intervention on the issue relevant to their motion—the modification of conservatorship. Likewise, when Malmquist's attorney testified to his fees, the grandparents did not object. Malmquist's attorney stated in response to their cross-examination that he was owed over $30,000 for the current litigation. Although he did concede that this amount covered the entire proceeding, beginning with Moe's motion filed a year before the grandparents intervened, the grandparents never argued to the trial court that the fees should be segregated on this basis. And, in any event, the trial court only assessed $20,000 in favor of Malmquist's attorney against Moe and the grandparents.

Following both the ad litem's and Malmquist's attorney's presentation of fees, the only arguments made by Harold and Irene on the issue of attorney's fees were (1) that "[Malmquist] doesn't need to be rewarded. . . . Because if that happens, he's going to be king of the world, and he's got empowerment problems and problems using his power and his authority" and (2) that interest should not be assessed on the awards. These arguments do not speak to whether it was error to not segregate the fees.

At the July 23, 2003, hearing on the motion for reconsideration of the June 2004 order, Moe's attorney stated that "the Court has no authority to assess attorney's fees or costs against [Harold and Irene]," to which the trial court asked, "Do you represent [the grandparents]?," and she responded, "No, not at this time." The court said, "then I don't want to hear any argument about that. . . . [L]et [their counsel] address that." Thereafter, the grandparents' attorney stated that "my

32

instructions from [Harold and Irene] with regard to the motion for reconsideration are to be neutral about it, let the Court make whatever decisions it makes. . . . [T]hat's all I have to say about the motion for reconsideration." The trial court then ruled, stating that "the motion for reconsideration is, in all respects, denied." Although Harold and Irene subsequently asserted the failure to segregate as an error in a motion for new trial on July 26, 2004, this came after their counsel waived any error at the hearing.

In any event, when non-parents intervene in suits affecting the parent-child relationship, those parties are equally subject to having attorney's fees assessed against them, and there is no requirement that the fees be segregated between the parental and non-parental parties. *See Garner v. Garner*, 673 S.W.2d 413, 415, 418 (Tex. App.—Fort Worth 1984, writ dism'd w.o.j.) (not abuse of discretion to award attorney's fees against mother and maternal grandparents, where maternal grandparents intervened seeking custody against wishes of mother, but custody was awarded to paternal grandparents); *Yancey v. Koonce*, 645 S.W.2d 861, 864-65 (Tex. App.—El Paso 1983, writ ref'd n.r.e.) (not abuse of discretion to award attorney's fees against both father and paternal grandparents, where latter intervened seeking custody of child in event that custody not awarded to father). Section 106.002 provides the court broad discretion in a suit affecting a parent-child relationship to award attorney's fees as it deems "reasonable." Tex. Fam. Code Ann. § 106.002. There is no need to segregate attorney's fees for separate claims if they "arise from the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts." *Villasenor*, 911 S.W.2d at 420. Here, all issues raised in the underlying litigation—whether concerning the requests to modify conservatorship or the requests to hold Moe and Malmquist in contempt for violating court orders—centered on what should be done in the

33

children's best interest and were, therefore, dependent on the same facts—those concerning the parents' actions and what the best home environment would be for the children.

Given the grandparents' failure to cite supporting authority, their failure to raise the issue before the trial court, and the existence of authority contrary to their position, the trial court did not abuse its discretion in finding that it was reasonable to award the attorney's fees against Moe and the grandparents, jointly and severally, without segregation of those fees.

*Ad litem's fees*

Harold and Irene's final ground for complaining that the trial court abused its discretion in assessing attorney's fees against them, jointly and severally with Moe, is that they should not be responsible for any of the ad litem's fees because they did nothing to necessitate the ad litem's appointment or continued involvement. While we agree that an ad litem's fees should not be taxed against a party who was not responsible for any of those fees being incurred, *see Dawson v. Garcia*, 666 S.W.2d 254, 265 (Tex. App.—Dallas 1984, no writ), we disagree with the grandparents' contention that they have no such responsibility in this case.

The ad litem's purpose was to represent the children's best interests, which included her work to determine who should be appointed and/or maintained as a conservator for the children. *See* Tex. Fam. Code Ann. § 107.021 (West Supp. 2004-05). The grandparents intervened, seeking appointment as the children's sole and/or joint managing conservators, thereby contributing to the need for the ad litem's continued involvement in the case. The grandparents' intervention required additional preparation and time on the ad litem's behalf, such as her having to organize a home study for the grandparents and having to prepare cross-examinations of them and the multiple witnesses

they called on their behalf. Although the grandparents were not acting in bad faith, that is not a requirement in order to hold them responsible for a portion of the ad litem's fees. *See Dawson*, 666 S.W.2d at 265. Moreover, as discussed in relation to the segregation of fees, the ad litem's testimony demonstrates that the only fees assessed in her favor against Harold and Irene were those that accrued following their intervention and in relation to their issue—the modification of conservatorship.

This case is distinguishable from *Minns v. Minns*, which held it was an abuse of discretion for the ad litem's fees to be assessed, jointly and severally, against the father and the paternal grandmother, who intervened asking to be named as a possessory conservator with visitation rights. 615 S.W.2d 893, 897-98 (Tex. App.—Houston [1st Dist.] 1981, writ dism'd). The holding in *Minns* was based on the court's determination that the grandmother was a "successful" party because she was granted the relief requested in her petition. *Id*. at 898 (citing Tex. R. Civ. P. 131 (successful party to a suit shall recover costs from adversary)). Unlike the grandmother in *Minns*, here the grandparents were ultimately not successful, given that they were not appointed sole or joint managing conservatorship as requested in their petition. Based on this and on the facts that they contributed to the ad litem's work and that the trial court only assessed the portion of the ad litem's fees that accrued after their involvement and in relation to their issue, it was reasonable for the trial court to hold Harold and Irene responsible for part of the ad litem's fees.

The trial court did not abuse its discretion in awarding attorney's fees in favor of Malmquist's attorney and the ad litem, against the grandparents and Moe, jointly and severally, on the grounds that the fees constituted an impermissible sanction, that the fees should have been

segregated, or that the grandparents did not contribute to the need for the ad litem. Harold and Irene's second and third issues are overruled.

**Family Code section 261.106**

In Moe's sixth issue and in the grandparents' fourth[22] issue, they assert that it violated section 261.106 of the family code to award attorney's fees against them because they are "immune" from the imposition of the fees based on their "good faith . . . participat[ion] in a judicial proceeding arising from a report, petition, or investigation of alleged child abuse." Tex. Fam. Code Ann. § 261.106 (West 2002). Moe and the grandparents urge that, because they supported their requests to be awarded conservatorship over Malmquist with allegations that Malmquist abused the children, they should be immunized from paying any attorney's fees incurred in litigating this custody battle.

Neither Moe nor the grandparents, however, once mentioned this statute or claimed immunity before the trial court, even in Moe's *Motion for Reconsideration of Award of Attorney's Fees* or in the grandparents' *Motion for New Trial*, which was dedicated solely to the challenge of the attorney's fees. Therefore, error was not preserved on this issue. *See* Tex. R. App. P. 33.1.

In any event, the immunity prescribed by section 261.106 would not protect Moe or the grandparents here because this litigation primarily concerned the modification of a custody order; it was not a "child abuse case." "The clear import of the progression of the [duty-to-report] statutes is that the legislature intended to protect reporters of child abuse from *liability for the act of reporting the abuse itself*, not from civil or criminal liability generally. *State v. Harrod*, 81 S.W.3d

---

[22] Although not designated as the grandparents' "fourth" issue, it was the sole issue asserted in their supplemental brief, following the three issues raised in their initial brief.

904, 908-09 (Tex. App.—Dallas 2002, pet. ref'd) (emphasis added) (statute's immunity does not extend beyond act of reporting abuse, assisting in the investigation of abuse, or testifying in a child abuse trial).

Moe's sixth issue and the grandparents' fourth issue are overruled.

**Void Order after Expiration of Plenary Power**

In their final challenge to the award of attorney's fees, Moe and the grandparents urge that the award of appellate fees in favor of Malmquist's attorney, against them jointly and severally, should be reversed because it was contained in a void order issued after the expiration of the trial court's plenary power. *See* Tex. R. Civ. P. 306a, 329b (regarding timetables for plenary power). Malmquist agrees that the October 2004 reformed order, which contained the $5,000 appellate award, was void, but he asserts that the award should be upheld as a "temporary order" under section 109.001. *See* Tex. Fam. Code Ann. § 109.001(a) (West 2002).

Section 109.001(a) provides that

> [n]ot later than the 30th day after the date an appeal is perfected, on the motion of any party or on the court's own motion and after notice and hearing, the court may make any order necessary to preserve and protect the safety and welfare of the child during the pendency of the appeal as the court may deem necessary and equitable. In addition to other matters, an order may: . . . (5) require payment of reasonable attorney's fees and expenses.

*Id*. By its plain language, this provision does not apply to preserve the award of Malmquist's appellate attorney's fees. Here, after the appeal was perfected, there was no motion filed by any party or by the court *sua sponte* seeking the temporary award of appellate attorney's fees on Malmquist's behalf. *See id.* Even if Malmquist's previous motion, filed in July 2004, were

37

considered as satisfying this requirement, there was no notice given to the parties about a temporary order for appellate attorney's fees and no hearing on the matter, as required by the statute. *See id.*

Because there was no temporary order entered awarding Malmquist's attorney appellate fees and the October 2004 reformed order that attempted to do so was void, we vacate the $5,000 in appellate fees awarded in favor of Malmquist's attorney. Moe's seventh issue[23] and the grandparents' first issue are sustained.

## CONCLUSION

The trial court did not abuse its discretion in issuing its final order of June 28, 2004. The order issued on October 18, 2004, which attempted to add an award of appellate fees in favor of Malmquist's attorney, is void. Accordingly, we affirm the June 2004 order in all respects and vacate the October 2004 order.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear: Opinion by Justice Patterson;
    Concurring Opinion by Justice Puryear

Affirmed in Part; Vacated in Part

Filed: August 31, 2005

_____

[23] Moe states that her fifth, sixth, and seventh issues regarding the attorneys constitute a challenge to seven findings of fact issued by the trial court in relation to that order. The record demonstrates sufficient evidence to support those findings.